UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | | |
|---|---|---|
| ELVA MANDOKI, | ) | 3:11-cv-00398-HDM-WGC |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER |
| vs. | ) | |
| | ) | |
| CARSON-TAHOE REGIONAL MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

Before the court is defendant's motion for summary judgment (#27). On June 6, 2011, plaintiff filed a complaint in this court alleging a single cause of racial discrimination (#1). Defendant filed a motion for summary judgment (#27), plaintiff opposed (#32) and defendant replied (#36). For the reasons set forth below, defendant's motion is granted.

**I. Factual Background**

Plaintiff is Elva Mandoki, a United States citizen who was born in Mexico and is of Hispanic descent. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. A ("Mandoki Dep."), 10:25-11:7). Defendant is Carson-Tahoe Regional Health Care, improperly named Carson-Tahoe Regional Medical Center, ("CTRH"). (Def.'s Mot. Summ. J. Ex. B

1

("Wilkens Decl."), ¶ 2). Mandoki was employed by CTRH as a nurse beginning in 2002 until her termination in 2009. (Mandoki Dep. 22:16-23).

Mandoki began working in the nursing field in 1996, when she took a position as a Certified Nursing Assistant in a nursing and rehabilitation center. (Mandoki Dep. 17:7-9; Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. B). In 1998, Mandoki became a Licensed Practical Nurse. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. B). Thereafter Mandoki attended classes in order to receive her Registered Nurse ("RN") license. (Mandoki Dep. 18:7-16). On July 1, 2002, the defendant hired Mandoki as a graduate nurse and assigned her to the night shift in the Surgical/Orthopedics Unit. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. D; Shirey Decl. ¶ 2). On September 5, 2002, after completing her requirements for an RN and receiving her RN license, Mandoki was promoted to staff nurse. (Wilkins Decl. ¶ 2; Mandoki Dep. 18:7-9; Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. E). In or about June 2005, defendant promoted Mandoki to team leader. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. G). Later, Mandoki applied for the position of charge nurse. (Def.'s Mot. Summ. J. Ex. D). In November 2005, Mandoki's supervisor, Leighanne Shirey, promoted Mandoki to charge nurse-the position Mandoki occupied until her termination. (Mandoki Dep. 30:25-31:23, Shirey Decl. ¶ 3; Def.'s Mot. Summ. J. Ex. E; Pl.'s Opp'n Def.'s Mot. Summ J. Ex. H).

As the charge nurse for the night shift in the Surgical/Orthopedics Unit, Mandoki was responsible for facilitating all patient care for the overnight shift, and also remained responsible for her own assigned patients. (Def.'s Mot. Summ. J. Ex. F; Shirey Decl. ¶ 4). Mandoki also acted as a resource and

facilitator for other staff nurses. (Def.'s Mot. Summ. J. Ex. F; Shirey Decl. ¶ 4). Further, Mandoki was responsible for following established hospital policies. (Def.'s Mot. Summ. J. Ex. F). At the time of hire, she was required to have passed the hospital's medication test and be trained in hospital policies, including use of the Pyxis machine. (Def.'s Mot. Summ J. Exs. F, K ¶ 20, N; Mandoki Dep. 63:18-64:2; 68:7-13; Dinauer Decl. ¶ 6).

Pyxis machines are located throughout the hospital in the hospital's different units. (Dinauer Decl. ¶ 2). The Pyxis machine is a means by which medication is provided to hospital patients. (Def.'s Mot. Summ. J. Ex. K). Each patient is assigned a profile, and when a doctor orders medication for that patient, the hospital's pharmacy enters the order into the computerization system, which then creates authorization to access the medication and deliver it to the patient. (Mandoki Dep. 64:7-18; Dinauer Decl. ¶ 2; Def.'s Mot. Summ. J. Ex. K). CTRH's Pyxis policy requires that all orders be reviewed by a pharmacist to ensure compliance with state and federal laws. (Dinauer Decl. ¶ 3; Def.'s Mot. Summ. J. Ex. K ¶¶ 3.4, 4.1). Under the policy, only authorized hospital employees may administer medicine to patients. The lone exception is the employees of the Emergency Department ("ED"). (Def.'s Mot Summ. J. Ex. K ¶ 10.2-.3). The ED may dispense medicine for at home use after pharmacy hours because unlike other departments, the ED has a physician present at all times.[1] (Dinauer Decl. ¶ 5; Def.'s Mot. Summ. J. Ex. M). Even

---

[1] NAC 639.450 provides: "'[d]ispense' means the furnishing of a controlled substance or dangerous drug in any amount greater than that necessary for the present and immediate needs of the ultimate user. The term does not include the furnishing of a controlled substance or dangerous drug by a pharmacy in a medical

3

CTRH's pharmacy cannot furnish medicine to patients upon release from the facility because the hospital is not licensed to do so. (Def.'s Mot. Summ. J. Ex L).

Users of the Pyxis machine are assigned a password and also use a fingerprint to access the medication for that particular patient once the medication is placed into the patient's profile. (Mandoki Dep. 64:19-23). Privileges to the Pyxis machine differ by user. (Mandoki Dep. 64:24-65:1). For example, new nurses are unable to obtain narcotics. (Mandoki Dep. 65:2-6; Def.'s Mot Summ. J. Ex. K ¶ 4.2). Other employees possess override capabilities to obtain medication not within the system that can't be provided due to the closure of the pharmacy. (Mandoki Dep. 66:7-18; Def.'s Mot. Summ. J. Ex. K ¶ 4.2). In such cases, the employee seeking the medication will manually override the Pyxis system, then a report will automatically be sent to the pharmacy, and the report will be reviewed by the pharmacist in the morning. (Def.'s Mot. Summ. J. Ex. K 4.4-5).

On the night of October 28, 2009, Mandoki was working as the charge nurse during the night shift at CTRH in the Surgical/Orthopedic Unit. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. L). Mandoki, in her capacity as charge nurse for the Unit, assigned a particular patient to Nurse Cassady Jeremias, a newly licensed RN. (Mandoki Dep. 76:25:77:1; Def.'s Mot. Summ. J. Ex. O ("Jeremias Decl.") ¶ 1). This patient was recovering from an appendectomy, but was not considered an inpatient. (Mandoki Dep. 76:19-25, 82:24-83:1). Mandoki instructed Nurse Jeremias to discharge the

---

facility to an inpatient of the medical facility in which the pharmacy is located."

4

patient once he met the parameters for discharge, including being pain-free. (Mandoki Dep. 78:3-8).

Around 9:30 p.m., Nurse Jeremias informed Mandoki that everything was going OK with the patient, but he was still having a lot of pain. (Mandoki Dep. 78:9-12; Jeremias Decl. ¶ 2). Since there were no orders for pain medications to give the patient, Mandoki told Nurse Jeremias to telephone Dr. De Mar, the patient's physician. (Mandoki Dep. 78:13-14; Jeremias Decl. ¶ 2).

Mandoki overheard Nurse Jeremias' call to Dr. De Mar. (Mandoki Dep. 78:25-79:11). According to Mandoki, she heard Nurse Jeremias repeat back the Doctor's orders. (Mandoki Dep. 79:12-18). The Doctor's order included an IV of Morphine and six (6) Percocet to take home until a prescription could be filled in the morning. (Mandoki Dep. 79:19-20; Jeremias Decl. ¶ 2). Dr. De Mar also allegedly instructed Nurse Jeremias not to keep the patient overnight. (Mandoki Dep. 79:6-11, 79:22-80:2). Mandoki then directed Nurse Jeremias to fax the Percocet order to the pharmacy while Mandoki administered the morphine. (Mandoki Dep. 80:3-6; Jeremias Decl. ¶ 2). Later, Mandoki saw Nurse Jeremias next to the fax machine. She assumed Jeremias had sent the order to the pharmacy, and gave Nurse Jeremias the morphine to administer herself. (Mandoki Dep. 81:11-16).

Around 11:30 p.m. that night, Nurse Jeremias informed Mandoki that the Percocet Dr. De Mar had ordered was not loaded to the patient's profile in the Pyxis machine. (Mandoki Dep. 83:8-12; Jeremias Decl. ¶ 3). Mandoki proceeded to use the Vocera, an intra-hospital communication device, to call down to the administrative coordinator or house supervisor for assistance.

5

(Mandoki Dep. 83:22-84:2). On the receiving end of the Vocera was Renee Crookham, Night Shift House Administrator. (Mandoki Dep. 84:11-12; Jeremias Decl. ¶ 3). Mandoki told Crookham that there was an order for Percocet for an out-patient, that the Percocet was not loaded into the Pyxis and asked if Crookham could get the Percocet for them. (Mandoki Dep. 84:11-14). Crookham indicated that she "did not know, but [to] call down here and talk to the pharmacy." (Mandoki Dep. 84:15-17). Crookham then handed the Vocera to pharmacist Susan Williams, who Mandoki claims did not identify herself. (Mandoki Dep. 84:18-20, 87:5-9; Def.'s Mot. Summ. J. Ex. P ("Williams Decl.") ¶ 3). Mandoki explained who she was, that she was working in the Surgical/Orthopedics Unit, that they had faxed a doctor's order for six Percocet that were not in the patient's profile, and she wanted the pharmacy to send the Percocet up because the patient needed to go home with the pills. (Mandoki Dep. 84:21-24, 87:15-21). The pharmacist responded she could not give Mandoki the Percocet because it would "be against [her] license." (Mandoki Dep. 84:25-85:1, 87:22-24; Williams Decl. ¶ 3). At this point in the conversation, Mandoki may or may not have told the pharmacist of her intent to override the Pyxis system to obtain Percocet for the patient.[2] (Mandoki Dep. 88:7-13).

Mandoki asserts that because the woman in the pharmacy did not represent who she was or what her position was, the late hour, the pharmacist's disconnected attitude, the representation that filling the prescription would be against the pharmacist's license, and

---

[2] In her deposition, Mandoki stated "I guess I might have said I'm going to override the two, I'm going to take from the Pyxis, but it was more like talking to myself, because I knew I couldn't take two pills by myself with a witness from our Pyxis on the floor." (Mandoki Dep. 88:7-13).

6

that nobody from the pharmacy had previously called up to the unit to say the order was incorrect, Mandoki believed that the person she was speaking to was a pharmacy technician and not the pharmacist. (Mandoki Dep. 85:6-8, 87:13-88:1).  Furthermore, Mandoki believed her actions were authorized because she had previously given patients painkillers when discharging them from the ED, where she was a floating nurse.(Mandoki Dep. 73:16-74:13, 89:7-91:18).  Thus, allegedly upon these mistaken beliefs, Mandoki chose to override the Pyxis system to obtain the Percocet pills. (Mandoki Dep. 93:12-94:3; Jeremias Decl. ¶ 3).

    Nurse Jeremias could not override the Pyxis system by herself to obtain the Percocet because she only had the authorization to obtain Percocet from the machine if an order was entered. (Mandoki Dep. 94:8-11).  Since no order was entered, and Nurse Jeremias was relatively new, Mandoki's override privileges were required. (Mandoki Dep. 94:8-22). Mandoki, in the presence of Nurse Jeremias, executed the override.  (Mandoki Dep. 92:25-96:3, 94:4-7). Mandoki withdrew the maximum amount of two pills she could obtain via an override. (Mandoki Dep. 88:14-17). Nurse Jeremias then took the pills to give to the patient.  (Mandoki Dep. 94:23-25).  Mandoki did not instruct Nurse Jeremias to administer the pills to the patient because it was understood that the pills were supposed to go home with the patient. (Mandoki Dep. 95:1-5).  Shortly after Mandoki executed the override of the Pyxis, the patient was discharged. (Mandoki Dep. 94:23-25).

    At the end of Mandoki's shift, Mandoki attended a meeting where she disclosed to Crookham that she had discharged the patient before midnight with the two Percocet obtained using her override

1 powers. (Mandoki Dep. 97:22-98:25). Nothing further was
2 discussed. (Mandoki Dep. 99:25-100:2).
3    The day after speaking with Mandoki, pharmacist Williams
4 reviewed the override report and discovered Mandoki had withdrawn
5 Percocet to provide to the patient on discharge. (Williams Decl. ¶
6 4). Williams reported the incident. (Williams Decl. ¶ 4).
7    Upon appearing for her shift that night, Mandoki was told by
8 the day shift charge nurse that Mandoki had to go home. (Mandoki
9 Dep. 100:3-10). Mandoki refused to leave until she was told why,
10 so the day shift charge nurse told Mandoki to talk to the AC.
11 (Mandoki Dep. 100:11-13). Mandoki spoke with the day shift AC but
12 did not receive any information about why she was being sent home.
13 (Mandoki Dep. 100:18-101:9). When Mandoki arrived home, she found
14 a message from Shirey, her supervisor.(Mandoki Dep. 101:7-11). The
15 message indicated that an emergency happened during the previous
16 night and they would see Mandoki in Human Resources the next
17 morning. (Mandoki Dep. 101:10-16). Shirey called again and this
18 time spoke with Mandoki, but did not divulge the reason for the
19 meeting the next morning. (Mandoki Dep. 101:16-102:1).
20    The next day, Mandoki met with Shirey and Carie Wilkens from
21 Human Resources. (Mandoki Dep. 103:12-13). Mandoki asserts she
22 was told that since Mandoki had "prescribed and diverted"
23 narcotics, in violation of hospital policy, she was being
24 terminated and the incident would be reported to the Nursing
25 Board.[3] (Mandoki Dep. 102:19-103:1). Mandoki asked Shirey and

---

[3] The record belies this assertion. Mandoki was terminated for "dispensing" two tablets of Percocet in violation of hospital policy and practicing outside the scope of her nursing license. *See* (Mandoki Dep. 114:9-115:16; Wilkens Decl. ¶ 7; Shirey Decl. ¶ 9; Def.'s Mot. Summ. J. Exs. R, S).

8

Wilkens to call Dr. De Mar, Crookham, Nurse Jeremias, and Williams to substantiate Mandoki's version of the events. She alleges no inquiries were made. (Mandoki Dep. 103:2-5). Moreover, Mandoki was given an Employee Counseling Memo with an erroneous version of the events. *See* (Def.'s Mot. Summ. J. Ex. S).

On November 2, 2009, defendant submitted a complaint to the Nevada State Board of Nursing. (Def.'s Mot. Summ. J. Ex. T).

On November 4, 2009, Mandoki filed a wrongful termination grievance with the Employee Association. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. N).

On November 5, 2009, the Board notified Mandoki of defendant's assertion the Mandoki had practiced outside the scope of her RN license in dispensing Percocet to a patient for home use. (Mandoki Dep. 114:9-19).

On or about March 12, 2010, the Nursing Board determined that Mandoki's actions on October 28, 2009 did not warrant formal disciplinary action. (Mandoki Dep. 116:21-117:3). However, Mandoki received a statement of caution that she follow the policies and procedures in the different units in which she worked. (Mandoki Dep. 117:4-10).

On or about, December 29, 2010, the arbitration award relating to Mandoki's grievance was executed. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. P). The arbitrator determined that Mandoki was not terminated for just cause. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. P). Mandoki was reinstated as an RN at the same rate of pay as a charge nurse. (Pl.'s Opp'n Def.'s Mot. Summ. J. Exs. P, R). Mandoki was assigned to the Oncology Department because her previous position in Surgical/Orthopedics allegedly had been eliminated.

9

(Mandoki Dep. 147:23-148:9). Furthermore, a counseling memo was placed in her file per the terms of the arbitration award. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. P; Ex. S; Mandoki Dep. 161:24-165:2). Mandoki still disputes some of the facts contained in the memo. (Mandoki Dep. 162:2-10).

After her reinstatement, Mandoki attended work for a single day and then resigned because she could "not trust anyone." (Mandoki Dep. 160:19-23, 163:14-17; Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. T).

## II. Summary Judgment Standard

Summary judgment "shall be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Martinez v. City of Los Angeles*, 141 F.3d 1373, 1378 (9th Cir. 1998). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Lynn v. Sheet Metal Workers Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir. 1986); *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir. 1982).

Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[T]here is no issue for trial unless there is sufficient

1  evidence favoring the nonmoving party for a jury to return a verdict
2  for that party.  If the evidence is merely colorable, or is not
3  significantly probative, summary judgment may be granted."  *Id*. at
4  249-50 (citations omitted).  "A mere scintilla of evidence will not
5  do, for a jury is permitted to draw only those inferences of which
6  the evidence is reasonably susceptible; it may not resort to
7  speculation."  *British Airways Board v. Boeing Co.,* 585 F.2d 946,
8  952 (9th Cir. 1978); *see also Daubert v. Merrell Dow*
9  *Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993) ("[I]n the event the
10 trial court concludes that the scintilla of evidence presented
11 supporting a position is insufficient to allow a reasonable juror to
12 conclude that the position more likely than not is true, the court
13 remains free . . . to grant summary judgment.").  Moreover, "[i]f the
14 factual context makes the non-moving party's claim of a disputed
15 fact implausible, then that party must come forward with more
16 persuasive evidence than otherwise would be necessary to show there
17 is a genuine issue for trial."  *Blue Ridge Insurance Co. v.*
18 *Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Cal.*
19 *Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818
20 F.2d 1466, 1468 (9th Cir. 1987)).  Conclusory allegations that are
21 unsupported by factual data cannot defeat a motion for summary
22 judgment.  *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989).

**III. Mandoki's Title VII Racial/National Origin Discrimination Claim**

Mandoki fails to establish that there is a genuine issue of material fact in her discrimination claim.  Federal law prohibits an employer from discharging an employee on the basis of her race or national origin.  42 U.S.C. § 2000e-2.  The court follows the *McDonnell Douglas* framework on summary judgment.

11

Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of racial/national origin discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). In order to establish a prima facie case of racial/national origin discrimination, a plaintiff must show (1) that she belongs to a protected class; (2) she was qualified for her job and performing it satisfactorily; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Leong v. Potter*, 347 F.3d 1117, 1124 (9th Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802). Once plaintiff establishes her prima facie case, the burden of production shifts to the employer to provide a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* If the employer offers a nondiscriminatory reason, the burden returns to the plaintiff to show that the articulated reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "The requisite degree of proof necessary to establish a prima facie case for Title VII . . . on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 886, 889 (9th Cir. 1994).

Summary judgment is not appropriate if, based on the evidence in the record, a jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of the plaintiff's race. *Id.*

**A. Mandoki's Prima Facie Case**

It is undisputed that Mandoki is a member of a protected class since she was born in Mexico and is of Hispanic descent. (Mandoki Dep. 10:25-11:1). Second, it is undisputed that Mandoki was subject

12

to an adverse employment action because she was terminated from her employment with defendant. *See, e.g.*, (Mandoki Dep. 123:22-124:1); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281 (9th Cir. 2000). Defendant, however, disputes that Mandoki was performing her job satisfactorily, or was treated less favorably than individuals outside of her protected class. (Def.'s Mot. Summ. J., at 13)

The second prima facie prong requires that a plaintiff must establish that she was qualified for the position. Courts also have stated that a plaintiff must offer proof that she performed her job satisfactorily. *See e.g. Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). The defendant asserts Mandoki was not performing satisfactorily because she dispensed drugs in violation of protocol.(Def.'s Mot. Summ J., at 14).

The court in *Villiarimo v. Aloha Air*, addressed a similar issue. 281 F.3d 1054 (9th Cir. 2002). In *Villiarimo*, the defendant terminated one of the plaintiffs for an error in performing her job. *Id.* at 1059. Plaintiff admitted to the error, however, she claimed she was terminated because she was female. *Id.* The court was not entirely certain plaintiff had made her prima facie case, even given the low threshold of evidence required. *Id.* at 1062. The court noted:

> [a]s the district court correctly observed, it is not clear that Villiarimo has produced sufficient evidence regarding the second prong, i.e., that she was qualified for the position. *See Villiarimo*, No. CV-99-00252-SPK, slip op. at 7-8. Villiarimo admits that Aloha told her that she was fired because she did not perform her job satisfactorily. . . . Thus, it is not clear that Villiarimo was performing her job 'well enough to rule out the possibility that [s]he was fired for inadequate job performance.'

*Id.* at 1062 n. 8 (quoting *Pejic v. Hughes Helicopters, Inc.*, 840

13

F.2d 667, 672 (9th Cir. 1988)).  Nevertheless, the court went on to consider the remaining steps under *McDonnell Douglas*.  *Villiarimo*, 281 F.3d at 1062.

Here, Mandoki was told she was being terminated for dispensing narcotics to a patient upon discharge and this amounted to a violation of hospital policy and practicing outside of her nursing license.  (Mandoki Dep. 108:15-22, 114:12-115:1).  Although Mandoki has repeatedly indicated that she did not know the policy existed prior to her termination, defendant has shown evidence that the policy was in place at the time of the incident.  (Mandoki Dep. 119:21-120:2; Def.'s Mot. Summ. J. Ex. K).

However, Mandoki has presented evidence that she met or exceeded her job expectations during performance reviews, that she received multiple promotions, and she had never been disciplined prior to this incident.  (Pl.'s Opp'n Def.'s Mot. Summ. J Exs. F, G, H, I, J).  Although it is not clear that Mandoki was performing her job well enough to rule out the possibility that she was terminated for inadequate job performance, the evidence is sufficient to show that material issues of fact exist as to whether she was qualified for her position at the time she was terminated.

Whether employees are similarly situated is usually a question of fact.  *Hawn v. Executive Jet Management, Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (citing *Beck v. United Food & Commercial Workers Union Local 99*, 506 F.3d 874, 885 n. 5 (9th Cir. 2005)).  Individuals are similarly situated when they have similar jobs and display similar conduct.  *Vasquez v. County of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003).  "The employees roles need not be identical; they must only be similar "'in all material respects.'"

14

*Hawn*, 615 F.3d at 1157 (quoting *Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)). Materiality depends on context and the facts of the case. *Hawn*, 615 F.3d at 1157.

The plaintiff has presented evidence that Mandoki and Nurse Jeremias were similarly situated. First, Mandoki and Nurse Jeremias' jobs were similar. Both held RN licenses, both worked as nurses in the Surgical/Orthopedics Unit, and both were responsible for following hospital policies and procedures. (Mandoki Dep. 125:8-19). Second, Mandoki and Nurse Jeremias' conduct was similar. Mandoki executed the override of the Pyxis system to obtain Percocet pills while Nurse Jeremias witnessed the override. (Mandoki Dep. 94:2-7). The override was not possible without the participation of both Mandoki and Nurse Jeremias. (Mandoki Dep. 94:8-22). After the pills were withdrawn, the pills were provided to the patient to take home by Nurse Jeremias.(Mandoki Dep. 94:23-25). The conduct of both nurses violated defendant's internal policy of dispensing medication to patients for at home use. (Def.'s Mot. Summ. J. Exs. K, L). Nurse Jeremias' discipline consisted of a written warning, while Mandoki was terminated and her actions were reported to the Nursing Board. (Jeremias Decl. ¶¶ 4, 5; Wilkens Decl. ¶ 8; Shirey Decl. ¶ 10).

A substantial dissimilarity is that Mandoki was Jeremias' supervisor and she made the decision to distribute the Percocet, in violation of internal policy, and instructed Jeremias to dispense the pills. Accordingly, Mandoki has marginally presented evidence to sustain a prima facie showing of racial discrimination.

**C. Legitimate Reasons for Termination**

To rebut the presumption that it unlawfully discriminated

15

against plaintiff, defendant has offered a legitimate, nondiscriminatory reason for Mandoki's termination. Mandoki was terminated for dispensing a narcotic, in violation of hospital policy and had engaged in behavior outside the scope of Mandoki's nursing license. (Def.'s Mot. Summ. J. Ex. S). The dispensing policy does not apply to the ED because there is an on-staff physician present at all times. (Def.'s Mot. Summ. J. Exs. K, L, M). Moreover, defendant has provided a disciplinary chart which describes appropriate punishments in various situations. (Def.'s Mot. Summ. J. Ex. Q). Here, engaging in activity outside the scope of a nursing license is a major infraction, punishable by termination. (Def.'s Mot. Summ. J. Ex. Q).

Comparatively, CTRH asserts Nurse Jeremias was less culpable because she had only been an RN for four months, she consulted with Mandoki regarding the Percocet and Nurse Jeremias did not execute the override herself. (Dinauer Decl. ¶ 10).

To place Mandoki's termination in context, CTRH asserts that it has also terminated two other employees for the same offense (practicing outside scope of license), both of whom were Caucasian. (Wilkens Decl. ¶ 9). Furthermore, Mandoki was reported to the Nursing Board by Dinauer. (Dinauer Decl. ¶ 11). According to Dinauer, in the last five years, she has reported twelve other employees to the Board and that were all Caucasian. (Dinauer Decl. ¶ 13).

Accordingly, CTRH has provided a legitimate, nondiscriminatory reason for Mandoki's termination.

**D. Pretext**

Mandoki has not established that the defendant's alleged

nondiscriminatory reasons were pretextual. To survive summary judgment, Mandoki must produce enough evidence that a reasonable factfinder would conclude: a) defendant's alleged reason for discharging her was false, or b) that the true reason for her termination was a discriminatory one. *Nidds v. Schindler Elevator Corp.*, 113 F.3d 92, 918 (9th Cir. 1996) (citations omitted). To prove that defendant's motives for termination were pretextual, Mandoki points to a number of instances that she claims give rise to an inference of racial discrimination.

First, Mandoki claims that Shirey would not allow Mandoki to schedule herself as a charge nurse and Shirey reprimanded Mandoki for taking herself off the schedule. (Mandoki Dep. 121:4-122:14, 122:23-13). Second, Mandoki speaks of an incident where Shirey pressured Mandoki to refrain from writing a statement to the Employee Association in regards to an incident between another nurse and an interpreter. (Pl.'s Opp'n Def.'s Mot. Summ. J. Ex. L). Third, Mandoki states that Shirey spoke to Mandoki and another Hispanic nurse in an "abusive tone" and treated them differently. (Pl.'s Opp'n Def.'s Mot. Summ. J. Exs. L, K). Finally, Mandoki notes that members of upper management, Shirey, Wilkens, Dinauer and Molina all appear to be Caucasian. (Mandoki Dep. 143:6-144:20).

Mandoki also identifies other events she maintains give rise to an inference of discrimination. Mandoki speaks of an incident where Mandoki was accused of gossiping about other nurses. (Mandoki Dep. 130:2-133:11). Mandoki also claims that a "white nurse" was allegedly not punished/reported to the Nursing Board for writing orders for medications, which were not signed by doctors and that management had provided an email incident report to said "white

17

nurse." (Mandoki Dep. 133:17-135:1). Finally, Mandoki claims that Obstertics nurses had been engaging in the same behavior that got Mandoki terminated. (Mandoki Dep. 141:3-142:19).

Contrary to Mandoki's assertions, the record before the court does not give rise to an inference of racial or national origin discrimination. While the record demonstrates some animus between Shirey and Mandoki, there is insufficient evidence to infer that the source of that animus is Mandoki's race or national origin. In fact, there is evidence that Shirey promoted Mandoki twice and regularly gave Mandoki good evaluations. (Mandoki Dep. 50:5-7). Moreover, there is no evidence that the members of upper management ever made discriminating comments about Hispanic people, discussed Mandoki's national origin, or treated Mandoki or any other Hispanic employees differently. (Mandoki Dep. 143:6-145:1). In fact, Mandoki never complained of racial discrimination or harassment while employed with defendant. (Mandoki Dep. 169:16-19; Def.'s Mot. Summ. J. Ex. G).

The facts surrounding the investigation itself do not give rise to an inference of racial/national origin discrimination. The evidence supports an inference that, at the time of her termination, CTRH had in its possession sufficient facts that plaintiff violated hospital policy by dispensing narcotics to a patient for at home use. Even though the Nursing Board investigation found formal discipline by the Board was not necessary, and the arbitrator ultimately found Mandoki's termination to be without cause, neither suggest that Mandoki's termination was based upon race.

The evidence supports an inference Mandoki's actions on the night of her termination made her more culpable than the other

18

employees involved.  Nurse Jeremias engaged in similar behavior, but the evidence suggests her actions were based in part on Mandoki's guidance as charge nurse.  Furthermore, the is no evidence that Crookham and Williams violated any policy or procedure.

Aside from the incidents in which she was personally involved, Mandoki's other assertions are completely unsubstantiated by any evidence whatsoever.  Thus, they cannot serve as a basis for inferring that CTRH's reasons for termination were pretextual.

The record is not sufficient to establish a triable issue of fact that Mandoki's race or national origin was CTRH's true reason for terminating Mandoki.

**IV. Conclusion**

For the reasons set forth above, defendant's motion for summary judgment (#27) is **GRANTED.**

**IT IS SO ORDERED.**

DATED: This 8th day of November, 2012.

_____
UNITED STATES DISTRICT JUDGE